Case number 18-5661, Charles Fox et al. v. Amazon.com Inc. Argument not to exceed 15 minutes per side. Mr. Anderson, you may proceed for the appellate. Please the court, I'm Steve Anderson along with Donald Caparella and Mark Spear. We represent the Fox family in this case. Your Honor, I have reserved three minutes for the rebuttal. All right. On Saturday, January the 9th of 2016, early in the afternoon, the Fox's house in Nashville, Tennessee erupted into flames. 16-year-old Haley and 14-year-old Matthew were trapped alone on the second story of the house. Their father, Brian, alerted to the situation that was unfolding, raced home just in time to lead his children to jump out of separate second-story windows. The Fox has suffered severe physical and psychological injuries, the loss of their home and virtually every worldly possession. It is undisputed in this case that the cause of the fire was a hoverboard purchased from Amazon, the defendant. It is also undisputed that the manufacturer of the product is still to this day unknown. It is undisputed that Amazon took and kept every penny of the transaction with Megan Fox. It is also undisputed that Amazon, about a month before the incident at the Fox home, unilaterally halted all hoverboard sales worldwide because of the risks of, quote, fires and explosions. That's from Amazon's documents. And yet Amazon told no one. Help me with whether it is disputed or not that Amazon kept all the funding. There's an exhibit that shows a two-year period between January 1, 2015 and December 31, 2016 that shows a payment. And that wasn't that. Doesn't that cover the period that Ms. Fox paid? It does, Your Honor, but here's the problem. We sent an interrogatory to Amazon. I believe it was interrogatory number five. The record will correct me if I'm wrong. It's either five or six. But we sent an interrogatory to Amazon that asked them to break down by a penny every piece of the transaction between Megan Fox and Amazon. Where did every nickel go? The answer was to rely on Rule 33 where you could produce documents to answer the interrogatory. And Amazon specifically said see bait stamp number 2412. And that's the document Your Honor is talking about. 2412 merely shows a breakdown over two years between Amazon and this so-called third-party seller, W2M Trading Corporation. Amazon's 30B6 witness in depositions admitted that 2412, the bait stamp number, covered every transaction, all products for a two-year period. So essentially, Your Honor, the record before this court is Amazon kept every penny. They did not remit anything. They didn't answer the question. The only thing they did was show a document for a two-year series of purchases of some $1.6 or $1.8 million, which obviously was far broader than the $274 in change that Mrs. Fox had been charged on her credit card. So it's your position that that document doesn't show that that money was forwarded to the manufacturer? Well, there's a difference. You're talking about the seller here, not the manufacturer. So the document 2412 that Your Honor is talking about showed a two-year breakdown. As I recall, it's 15 and 16 between Amazon and W2M Trading Corporation for every product that W2M sold, allegedly sold over a two-year period without regard to breaking down product by product by product. It's a global look. So did Amazon send money to W2M Trading Corporation? Yes, it did on other products. But with respect to the record before the court on this exchange, there's no evidence that Amazon sent any money to anyone. They didn't track it for you? They had the opportunity and failed to? They had the opportunity, and I think it's certainly a reasonable inference. I just needed to understand your point. Right, thank you. I think it's a reasonable inference before this court that they kept it all, or else they would have told us. But isn't it equally reasonable that they paid it over? I mean, they paid over something like $1.4 million. Your client paid something closer to $300. And you are telling us, I believe, that because it wasn't specifically listed, your client's payment, having been remitted, that we should believe it wasn't, when it almost seems like the opposite may be the more reasonable conclusion. Well, Your Honor, the interrogatory, though, asked them, show me the breakdown on this product with Mrs. Fox. And the answer was, see our two-year picture. Which was a lot of money that Amazon remitted to the person that ultimately, W. Deal or whatever name it was going by. Your Honor, if Amazon had remitted any portion of Mrs. Fox's payment to W2M Trading Corporation, then Amazon would have produced it. They didn't. Any reason to believe that Amazon was in the habit of withholding the transmittal of other amounts that it received as a result of a purchase to, that supports your position? Yes, Your Honor. And as a matter of fact, there's documentation in the record that because of, that Amazon was protecting itself from refunds here. And that's why it withheld all the money. And it did it not just on W2M, we're talking about with the hoverboards. And did it with more than just W2M Trading Corporation. It did it with multiple so-called third-party sellers of hoverboards. Because it knew, based on its own internal information, that there were likely to be lots and lots of refunds. So the record before this Court is fairly compelling that Amazon never sent a single nickel to anyone for the Megan Fox purchase of the hoverboard. There's certainly no record before this Court of such a transaction. And there was an interrogatory specifically asking Amazon to give us that information. And it did not. Not to belabor this point too long, but are you speaking of withholding hoverboard monies after this December notice or before then? Because we know your client's purchase was earlier. Well, what it did, Your Honor, was the evidence is that sometime in December, as its investigation was going and it knew that it had a problem and likely a large number of refunds, there are internal emails saying around the 8th or 10th of December, I don't recall the exact date, but basically saying let's withhold all these monies from the third-party sellers. And so that's the evidence before this Court. And it's sort of a twist of irony because of the danger of this product, Amazon actually made more money because it kept and held on to it. Well, you know, let me ask you this. Is there a distinction between whether Amazon was withholding money on the specific item that is involved in this incident or whether it was holding money from that particular transaction because there was a running account and it was holding money as a corpus, for lack of a better way to put it, to balance out the account? I mean, is there a distinction between whether it was trying to not remit the money for that specific item or whether it's just a matter of what the state of the payments were on account? Your Honor, I think the record before the Court is that the reason Amazon withheld the money was because specifically of the risk of refunds on hoverboards. Did that answer your question? Well, not really, but I mean, is that conceded or disputed or does the record show that that's the case? Yes, Your Honor. The record is fairly clear that Amazon withheld money from hoverboard sellers because of the risk of refunds. There's emails, internal emails that were produced in before the District Court. All right. Why don't we move on? Well, in this case, Your Honor, there's more. The two issues we're raising is whether Amazon's a seller under the Tennessee Product Liability Act and then obviously a separate cause of action for negligent failure to warrant, which we've already talked about in some parts. But in this case, the Tennessee definition of what a seller is says, a retailer, wholesaler, or distributor, and importantly, any individual or entity engaged in the business of selling a product. We respectfully submit that this definition certainly can contemplate more than one seller in this case, the language individual or entity engaged in the business of selling a product. The District Court itself said that a retailer was a person or entity engaged in the business of selling personal property. The Wayfair case, which we cited, the Supreme Court opinion, refers to Amazon specifically as the largest retailer in the world and refers to it as a remote seller. And that was from last summer, that opinion. Amazon could fall under the definition of distributor in this case because it had the product in its possession. There's evidence suggesting that. But in this case, at the very least, Amazon falls into the individual or entity engaged in the business of selling. Your Honor, Do you have a case that defines Amazon as a seller pursuant to the definition that you're asking us to adopt? No, Your Honor. There hasn't been any case that we're aware of that's found them a seller. The Tennessee statute, however, is far broader and the facts of this case are far, far different than anything that has come before a court before. In every one of the cases that Amazon relies on, you either had one or both of the following situations. You had a narrow statutory construct and or a situation where it was a one-off purchase. A dog collar here, a caffeine powder, something one at a time. Nothing with a level of intentionality that was in this case. In determining who is the seller, what about the issue of control in terms of deciding what the price is going to be, what specifications the product have to meet, that kind of thing. I mean, it's one thing if Amazon is a conduit because it accepts whatever product is provided. It would be another thing if it provided specifications that the product had to meet and that kind of thing. So what about the issue of control in defining who the seller is? Well, the district court talks about that and, Your Honor, I would submit a couple of things. We don't say Amazon set the price, but what shows better control than unilaterally declaring in December that all hoverboards must be pulled off the market worldwide? Amazon didn't consult anybody to reach that decision. Nobody. It decided to pull the product off the shelf. In addition... It would have talked to the manufacturer about that, would it not? It did not. It did not. It simply had a meeting. It had written an internal investigation report and after that meeting on December 10, 2015,  It consulted nobody, Your Honor. It did it all on its own, which shows a whole lot of control and also issued another warning to those who had purchased it and already had them in their homes. It consulted nobody. I see that time has expired. May I ask a question? Sure. You know recently there has been a barring of certain planes from flying because of certain recent disasters. Would you, by analogy, claim that the FAA or the President who said these certain planes can no longer fly? Are the seller in control because of that action taken? It seems similar to me. Amazon stopped the sending of hoverboards. The President through the FAA has said no flying of that certain jet. No, Your Honor. Respectfully, I don't think it's analogous because in this case that would be like the FAA having control on the front end on how it was on the product and being within their possession, which we had, in terms of the issuing warnings about it and deciding what to say and not to say and also making all the money. Isn't that part of your client's argument that Amazon issued a warning and did so negligently? It is, which is a totally independent claim from the Product Liability Act. I see my time is up. All right. Good morning, Your Honors, and may it please the Court. Brendan Murphy for Amazon.com. I'd like to start by directly addressing Judge Clay's question about cases on the Amazon marketplace. There is no case anywhere in this country that has ever found Amazon or any other form of marketplace liable as a seller, and that makes good sense because what did Amazon do here? It provided a website on which third-party sellers, in this instance WDeals, put an offer. There's no dispute that WDeals wrote out its offer and that Amazon contributed no content to the product detail page. WDeals is the entity that sourced the product and had the control over the product, owned the product, and set the price for the product. All of the elements of selling, offer, acceptance, pricing, and ownership and sourcing, point directly to WDeals. Nothing points to Amazon. The Steiner case is an excellent recent example from the Ninth District Court of Appeals in Ohio because that court was interpreting a Product Liability Act that's actually quite a bit broader than Tennessee's. Tennessee's is narrow because it says selling is basically selling. It's a little bit circular, but as the district court did, you look to the underlying commercial law for what the understanding of selling is, and it gives a couple of specific examples, wholesaler, distributor, and retailer, and then it also gives two very specific examples of non-sale transactions where the Tennessee legislature thought there could be seller liability, and that's a lessor and a bailor. What it does not have is a phrase like in the Ohio statute that talks about otherwise participating in the distribution of products or putting a product in the line of commerce, and that's the language the Steiner court was interpreting, and that language is much, much broader than what the Tennessee legislature drafted in 1978 and has not revisited since, even though in 2011 it did do a comprehensive revision of the seller liability portion elsewhere in the statute. And the Allstate case out of the District of New Jersey... But just because Steiner was talking about a distinct law, why would you then be able to draw the conclusion that physical possession, movement, storage doesn't have something to do with who a seller is? So the reason for that, and there are two in this particular case. One is that the FBA service, I think that's what you may be referring to, the fulfillment by Amazon service, is just a logistic service where Amazon permits third-party sellers to send their inventory for storage in an Amazon facility where it charges fees for that, and you can see on the detail that we were talking about in the appellant's argument, document 2412, that WDeals did in fact use fulfillment by Amazon services for some of its products because their FBA service fees reflected on there. That was not the case in this transaction. The particular product, the transaction record... There's some dispute about that, isn't there? There's not a reasonable dispute. They have a different perception that is based on no evidence at all. Their perception is based on seeing the Amazon standard identification number for this particular product on a so-called dangerous goods inventory, and that just refers to dangerous goods as the title for the regulations relating to hazardous materials, of which lithium-ion batteries are considered hazardous materials. And all that means is that some seller on that particular ASIN used FBA services. There were a lot of sellers on that ASIN, WDeals being one of them. But when you look at the actual records, which we did a comprehensive review of the records, and Damon Jones testified about this, that all the records, including the specific transaction detail, indicate that this was what's called a merchant-fulfilled network sale. It was fulfilled entirely by the merchant, and it was charged accordingly, $41.26. So we don't have to decide right now whether there was a dispute of material fact. Let's put that aside. Why isn't possession and movement and holding of goods a consideration in determining whether someone's a seller? Because it doesn't constitute any part of selling under the underlying commercial law that forms the understanding of what selling is. That understanding, which is in 2-106 of the Tennessee Commercial Code, focuses on title, and the rest of the UCC focuses on offer and acceptance. If possession were an element of selling, then Federal Express, United Personal Service, the Postal Service, and any number of other entities who have a possessory nexus. Well, if it were the only issue. But what we're talking about is what constellation of factors one looks to to determine who a seller is. We're in a different world now. This is not the world where A makes a product, takes it over to his shop, and sells it. This is a world in which Amazon has created the ability and opened a marketplace of American consumers to entities across the world that have not had access to American consumers. And it is their platform that has opened that possibility to those manufacturers. So as the Wayfair case says, we're in a new e-commerce arena. And I'm thinking about what the Products Liability Act addresses. Its purpose is to, and let me quote it so I've got it correctly, to ensure that an injured consumer may maintain a strict liability action against whomever is most likely to compensate him for his injuries. And so, in other words, Miller notes, our case notes, that so this policy that underlies it is the burden of preventing the harm is placed on the person, the party, best able to prevent the harm. And in the world that we find ourselves now, where Amazon has, I think, 50% of the U.S. e-commerce market, 90% of the market share of a significant number of product categories, and is opening the door of American consumers to all of those products, why is it not the party best place to prevent the harm of the products that it's making available to American consumers? So the Miller case, I'll absolutely directly answer that question. The Miller case was talking about placing it on the entity best able to do that specifically in terms of the seller. It wasn't talking about, as a general proposition, that the court should just look to deem to be a seller whoever is in the best position to prevent harm or whatnot. Fair. I don't dispute that. But in the world we're in now, what you and I are talking about is how do we now define seller? Has seller taken on new dimensions relative to our new commerce? It has not, because the basic elements of selling, whether it's done in a brick-and-mortar establishment or online, are the same. Somebody makes an offer, somebody accepts the offer. In this case, it was Mrs. Fox. Somebody sets a price, and somebody sources a product, and it just happens to, and somebody transports it from point A to point B. That's all the same, whether it's brick-and-mortar or in e-commerce. What has changed is in the brick-and-mortar world, you can't pack millions of sellers into one place. It would be a mall that covers the entire state of Ohio. But with e-commerce, really the only change is that millions and millions of new people who have not been able to have access to selling and also buying are now able to do it. But the basic elements of selling remain the same. There may very well be a fascinating policy discussion about what role marketplaces have, but that's a policy discussion that the elected representatives of the people of Tennessee can and perhaps should have, because the Tennessee legislature in 1978 withdrew from the common lawmaking, policymaking of the courts in this product liability area and very specifically defined who is going to be liable. And it did so with two things in mind. And this is in the preamble of the 1978 Act. So it's not legislative history. It's an actual statement of legislative purpose. They had two focuses. One was on cost and two was on product selection. They were concerned and they were reacting to the expansion of liability that had taken place in the 1960s and early 1970s that were making products more costly and having fewer of them. And just stepping back, I think we have to look at what is Amazon's real role here. Amazon provided a website that third-party sellers, including WDeals, were able to access to make their offer. But the basic elements of selling remain the same. There's really no nexus between Amazon, the Foxes, and this hoverboard other than having a website. And no court anywhere in any context has suggested that that kind of nexus is sufficient. Let me ask you, you heard Mr. Anderson's arguments and it dovetails with the question you were asking from my colleague. The control that Amazon had and exerted by stopping the shipment of hoverboards and he says also the transmittal of payments after some point, it seems to strike like a bit more of a relationship than just hosting a website. And the real question I have, and maybe you can fold in an answer to this, is it appears that Amazon assumed a duty to warn. And you're being challenged saying that you assumed it and you did it negligently. From what source did that duty arise if you're just the host of this website? Well, so to start with what Amazon did, and I think it was a little bit of an incorrect characterization by the appellants, Amazon did not stop sales worldwide. Hoverboards were and continue to be sold by all kinds of other places. What Amazon did was to remove the listings of hoverboards on its own website. We don't dispute that Amazon can't control what gets sold on the website. For example, you can't sell a gun on the website. That's just prohibited. So Amazon has the ability to control what people can sell on the website. So it was a much narrower action than what was characterized. Now, Amazon is a customer-centric company. That is one of the core leadership principles that flows right from Jeff Bezos on down to the bottom. And it acted very much in the customer's interest. Two weeks before Christmas, with the hottest selling holiday item of that year, it totally ceased sales on Amazon.com of all those things and told everyone that they can get a refund of their product no matter where they bought it. Most of these things were bought by third-party sellers or sold by third-party sellers. So Amazon actually put itself out there and exposed itself to financial hit for which it was not really responsible. In what you're talking about now, we are outside the argument you were making regarding legislation because now we're in traditional Tennessee tort law, right? Your Honor, if we accept that 323 applies, and I don't really contest it because Tennessee does apply 324A and it doesn't seem like there's a logical difference between those two or a reason to distinguish between them, if under the appropriate set of circumstances, if that activity met those elements, yes, there could be, in theory, an independent basis of liability. But those two elements are really important. And those two elements, one of those two elements has to be satisfied in order for a duty to arise. So one may criticize, and plaintiffs criticize Amazon for deciding to do something and then saying that they did it poorly. Okay, let's just accept that. We dispute that, of course, but that's not material because they haven't gotten to either of those two other elements that are necessary to create the duty. And one is reliance and the other is an increased risk of harm. And they've never really addressed that anywhere. In fact, they didn't even plead that until they never pleaded it. It was not in their original complaint and it was not in their amended complaint that they filed in December 2017 after discovery had basically closed. So the first time this 323 argument comes up is basically their opposition to our motion for summary judgment. And given that it was never really part of the pleadings, it's not surprising that the district court did not go into a great deal of custody. In terms of reliance, are you making reference to the dispute as to whether Megan Fox received the email or as to whether or not she read the email providing the notice from Amazon of a problem with the product? I'm specifically referring to the fact that she testified she doesn't remember seeing it. So there's no testimony in the record that she actually- But she says she reads everything she gets as a matter of course. So, I mean, it depends upon whether there's a presumption or whether it rises to the level of being considered a factual dispute or not. Well, there really is no presumption because under the case law, I think it's in Myers as well, the 1994 case from this court, the court talks about reliance and there has to be actual reliance. There's no inference of reliance I think is the main point of that case and some of the other cases. So the fact that there's nothing in the record indicating that Mrs. Fox read it. Maybe she did, maybe she didn't, but she has no memory of seeing it. She certainly didn't take any act based on an email she does not remember seeing. Is there a testimony that if she had information about the fires, if that had been provided in an email, she would have removed the hoverboard from her home? She did testify to that. I think she says it in her affidavit as well. And I think that actually goes, that's really a post-sale failure to warn claim. She is saying, the plaintiffs are saying, if I had received a more fulsome warning about a hazard, I would have taken some action. In other words, I would have relied on something had something been said. And to tie that into the other element, the increased risk of harm, what they're talking about, their claim is really that Amazon didn't do enough to decrease the risk of harm. And the Myers case is the 1994 case. Failure to warn. I'm sorry? Failure to warn. Yes, yes. And that case talks about how the failure to have safer practices and whatnot with the mine safety inspections, that's really a failure to decrease the risk. It is not a 324A argument. I see I'm out of time. I'm happy to answer more questions, Your Honors. No, and you are out of time. Thank you very much. Rebuttal. Yes, Your Honor. Even if the Court doesn't agree with us on the issue of the cellar, we have this issue of the duty to warn. The District Court clearly erred by saying that the plaintiffs had not mentioned Section 323. To be clear, in the record, entry number 154 at page 2160, plaintiffs specifically briefed 323 and 324. Your Honor, it is really a 324 case we submit. Essentially what happened here is, based on what Amazon says, they stepped into the shoes of the seller and issued a warning to a third party. So really, we don't have to have an increased risk of harm element under 324. On top of that, even if we went to 323, Amazon did not even raise the increased risk of harm in their summary judgment briefing. We can prove that in any event. Really, Your Honor, what we need to do here is juxtapose what Amazon knew and then what it said. Here's what it knew. It knew, by its own words, there were 17 fires or explosions in the U.S. alone, that there was a concern about safety across all Chinese manufacturers, that Amazon itself had its own contingency plans, including an expected, quote, sudden uptick in fires and explosions beginning on Christmas Day. They brought employees specially in on Saturday, December 26th, because of the sudden uptick in explosions and fires they were expecting. Then they sent an email out that says, there have been news reports of safety issues. That's it. They don't say fires and explosions. They don't say anything. The third highest person in their company sent an email that's in the record that says, essentially, be careful, employees, because your warning could be headline news. There's certainly a reasonable inference in this case. If Amazon had told people like the Foxes, hoverboard purchasers, any of the many facts that it knew, that they would have removed them from their home. How do we know that? The best evidence, the product safety director for Amazon pulled it out of his own home when he had purchased a hoverboard for his 11-year-old daughter. He admitted that in his deposition, Damon Jones. Now, the district court never mentioned that. He did that because he knew more than your client. Absolutely, Your Honor. Let me ask you this. Absolutely. The Tennessee Restatement of Torts consideration here. I know there are these disputes about the duty to warn and whether there was reliance and all this, but how would this duty to warn apply to third parties, the rest of Megan Fox's family? She may or may not have received or read the email, but even if she did, what protection would that have offered her family as a third party? Well, Your Honor, there's her minor children. They're clearly within the zone of her protection, and it's up to she and her husband to make the decision about what to do once given the information. And she's got testimony in the record that if I had known any of the things that they knew, including that the ASIN that they had purchased had been taken off the market, including all of them taken off the market, 17 fires and explosions, then it would have protected the entire family. The record's pretty clear before this Court on that issue. I see I'm out of time. Thank you. All right. Thank you very much. The case is submitted.